**PAGE TWO, INC.; Don't Ask, Inc.; David Page; and Matthew Iaria, Appellants (Defendants Below)**

**v.**

**P.C. MANAGEMENT, INC., Appellee (Plaintiff Below).**

**No. 49A02–8703–CV–93.**

Court of Appeals of Indiana, Second District.

Dec. 28, 1987.

---

Cory S. Brundage, Anthony P. Gillman, Kevin L. Stock, Ice Miller Donadio & Ryan, Indianapolis, for appellants.

Preston T. Breunig, John D. Schiff, Indianapolis, for appellee.

SHIELDS, Presiding Judge.

Page Two, Inc., Don't Ask, Inc., David Page, and Matthew Iaria (Page Two) appeal a declaratory judgment awarding possession of sublet premises to P.C. Management, Inc. We affirm.

### ISSUES

1. Whether Page Two waived its right to terminate the sublease of P.C. Management, and

2. Whether the trial court erred in determining the March 6, 1986 master lease did not terminate the sublease.

### FACTS

Page Two does not dispute the factual findings of the trial court. A summary of these facts follows.

LaScala Partnership, owner of a building located at 110 South Meridian Street, Indianapolis, Indiana, leased the building to Theodore Polk and Stephen Teets on June 19, 1984. Polk and Teets assigned the lease to a corporation they formed under the name P & T, Inc. In September, 1984, P & T agreed orally to sublease the second floor of the building to Charles and Patricia Perrin. On or about November 15, 1984, P.C. Management, a corporation solely owned by Patricia Perrin, opened a live comedy club at the sublet premises under the name "Indianapolis Comedy Connection." On March 6, 1985, P & T and P.C. Management executed a written sublease agreement for the second floor of the building.

P & T assigned its June 19, 1984 lease with LaScala Partnership to Page Two, effective March 6, 1986. On March 6, 1986, a new master lease was executed by LaScala Partnership as owner-landlord, and Page Two, d/b/a Don't Ask as tenant.

On May 28, 1986, P.C. Management moved its comedy club but continued to maintain and secure the subleased premises for storage. P.C. Management paid its monthly rent until November 14, 1986, when Page Two rejected P.C. Management's tendered monthly rent.

A few days after the comedy club moved, Page Two had the air conditioning and heating ductwork disconnected from the sublet premises. Thereafter, neither heating nor air conditioning service was provided to the sublet premises.

Under the sublease agreement, P.C. Management agreed to pay a portion of the utilities for the entire building based upon a square footage computation. When Page Two became the sublessor, P.C. Management's share was computed at twenty percent (20%). P.C. Management made these utility payments through June 5, 1986. In July, 1986, P.C. Management received a statement for electricity from June 5 to July 7. The amount was computed on the twenty percent (20%) basis, although P.C. Management's actual use of electricity during that time was limited to an exit light, an alarm system and an occasional use of lights. Charles Perrin, on behalf of P.C. Management, telephoned Page Two, protested the charge as excessive, and refused payment. In August and September, Page Two again submitted 20% billings to P.C. Management which P.C. Management protested in writing and refused to pay. Although Page Two never responded to these protests nor sent any further statements, it continued to accept the monthly rental payments.

In a letter dated September 8, 1986, P.C. Management notified Page Two that, under the provisions of the sublease agreement, it intended to exercise the first two-year renewal option for a term commencing on November 15, 1986. In a letter dated October 29, 1986, and received on November 3, 1986, Page Two notified P.C. Management that it was in default of the sublease agreement for failure to pay its share of the utilities and for failure to provide proof of insurance.

Although Page Two had never inquired or requested proof of insurance carried by

P.C. Management, P.C. Management had carried general liability insurance and coverage on the contents of the sublet premises. It cancelled the general liability coverage in June, when it ceased using the premises for the comedy club.

In a letter dated November 1, 1986, P.C. Management advised Page Two of its desire to open another comedy club in the sublet premises and requested a meeting to discuss the venture. The meeting never took place. In a letter dated November 13, 1986, Page Two declared the sublease agreement terminated and demanded possession. On November 18, 1986, P.C. Management tendered its monthly rental payment and made a conditional offer to reinstate the general liability insurance. Page Two refused the tender and offer. This suit followed.

## DISCUSSION

At Page Two's request, the trial court entered findings of fact required by Indiana Rules of Procedure, Trial Rule 52(A). The standard of review is as follows:

> [W]e will not set aside the judgment premised thereon unless it is clearly erroneous, *i.e.,* unless we are definitely and firmly convinced the trial court committed error. The findings must disclose a valid basis for the legal result reached in the judgment, and evidence at trial must support each of the specific findings, with deference given to the court where such evidence conflicts. We will not reweigh the evidence nor reassess the credibility of witnesses before the court but, rather, will affirm if there is sufficient evidence of probative value to support the decision, viewing the evidence most favorable to the judgment and the reasonable inferences drawn therefrom.

*Naderman v. Smith* (1987), Ind.App., 512 N.E.2d 425, 430, *quoting Campins v. Capels* (1984), Ind.App., 461 N.E.2d 712, 717 (citations omitted).

Page Two's claim that P.C. Management defaulted is based on purported violations of paragraphs 7 and 8 of the sublease which state:

7. Utilities. Sublessee shall pay for utilities used as determined on the basis of the square footage of the sublet premises to the total square footage of the premises, wherein such utilities are used.
8. Insurance and Liability. Sublessee shall maintain fire, casualty and personal injury insurance to protect sublessor in such amounts as are mutually agreed by the parties and memoralized in an attachment to this sublease. Sublessee shall be liable for all damage to the sublet premises and related damage to the premises, excepting that which is caused by sublessor's negligence. Any damage for which sublessee is liable shall be immediately repaired to the original condition. Sublessee shall hold sublessor harmless for any injury or damage occurring to the sublet premises or because of sublessee's activities.

Record at 394, Exhibit 3.

The right to terminate the sublease upon default is based upon paragraph 18 of the sublease which reads:

> 18. Rights on default. If sublessee shall neglect or fail to perform or observe any of the terms of the sublease for ten (10) days after notice, or fail to pay the rent or utilities for a period of thirty (30) days, then the sublessor may lawfully reenter and occupy the sublet premises, expel the sublessee and remove its effects without being deemed liable for trespass, and sublessor shall retain all remedies in law and in equity against sublessee for breach of the sublease.

*Id.*

### A.

First, Page Two argues the trial court erred in concluding it waived P.C. Management's default in paying its portion of the utilities because Page Two's right to declare default had not yet become "fixed" under the sublease agreement when it accepted the rent payments.

This argument misconstrues the trial court's judgment. The trial court found Page Two waived its right to terminate the sublease because it accepted monthly rent-

al payments from P.C. Management after notice that P.C. Management was protesting and refusing to pay the amount billed for utilities:

> The utility dispute was waived by Page Two, Inc. as a basis for termination when it accepted rent after each of the three protests made by P.C. Management. Moreover, P.C. Management disputed the utility bills in good faith. Defendants made no effort to discuss or resolve the dispute. The electricity actually consumed by P.C. Management was substantially less than the sum demanded during the relevant time. The dispute was premised on the lack of heating and air conditioning service during the relevant time, which was the result of actions of [Page Two].

Record at 163. Thus, contrary to Page Two's argument, the trial court did not find Page Two waived its right to terminate the sublease agreement by accepting monthly rental payments after P.C. Management was in default of its utility payments. Rather, the finding of waiver hinges on acceptance of rent after protest.

■ The appropriate issue, then, is whether the trial court erred in concluding Page Two's undisputed conduct of accepting monthly rental payments from P.C. Management after notice that P.C. Management was protesting the amount stated as due, constitutes a waiver of the contractual right to terminate the sub-

lease.[1] Implicitly, Page Two asserts it cannot because only the acceptance of rent after a breach for which a forfeiture might *then* have been declared is a waiver of a right to forfeit. We infer this position from Page Two's citation of *Eurengy v. Equitable Realty Corp.* (1937), Mo., 107 S.W.2d 68.

In *Eurengy*, the landlord sued the tenant for possession of the leased premises as a result of the tenant's failure to pay rent and taxes as required by the lease. The lease also required notice of any default and an opportunity to cure prior to the landlord's termination of the lease. The landlord accepted partial rent payments prior to sending the notice and after sending the notice of default, but not after the period allowed to cure the default had lapsed. The trial court found for the landlord over the tenant's claim of waiver based upon the landlord's acceptance of the partial payments. The supreme court affirmed the trial court because the landlord had not accepted payments *after* the landlord's right to declare a forfeiture became fixed, *i.e.*, after the tenant failed to cure the default within the time specified by the notice.

■ This case is inapposite because the issues are different. *Eurengy* holds only that waiver cannot occur based upon an acceptance of partial rental payments prior to the time the landlord has the right to forfeit the lease.[2] It did not involve, nor

---

**1.** Waiver is "the intentional relinquishment of a known right." *Lafayette Car Wash, Inc. v. Boes* (1972), 258 Ind. 498, 501, 282 N.E.2d 837, 839. Thus we must determine the intent of the party holding the right. Waiver is ordinarily a question of fact. *Salem Community Sch. Corp. v. Richman* (1980), Ind.App., 406 N.E.2d 269, 274. The general rule is that if a party to a contract performs acts that recognize the contract as still subsisting, such as accepting rent payments, specific performance of the terms of the contract is waived and there can be no forfeiture. *Snyder v. International Harvester Credit Corp.* (1970), 147 Ind.App. 364, 371, 261 N.E.2d 71, 74. This rule is founded on principles of common honesty: a landlord cannot take the position a lease is valid for one purpose, *e.g.*, collection of rent, and yet declare it invalid for other purposes. *See Waukegan Times Theatre Corp. v. Conrad* (1945), 324 Ill.App. 622, 632, 59 N.E.2d 308, 312. ("Any act done by a landlord knowing of a

cause of forfeiture by his tenant, affirming the existence of the lease, and recognizing the lessee as his tenant, is a waiver of such forfeiture.") *See also* 51 C.J.S. § 117(4) (1968) ("[T]he acceptance by a landlord of rent which accrues after the breach of a condition contained in the lease generally implies a waiver of the right to declare a forfeiture of the lease and re-enter because of such breach, whatever may be the ground of forfeiture...." (footnotes omitted))

**2.** In this regard it should be noted that Page Two received a protest and statement that the utilities would not be paid. Given the terms of the lease the statement created an anticipatory breach. In Indiana, an anticipatory breach of a contract excuses the other party from further performance, permits the other party to treat the contract as terminated, and allows the other party to immediately sue for damages. *Indiana*

does it attempt to address, the issue of whether other conduct, such as that upon which this trial court relied, can supply the elements of waiver.

On this point, Page Two argues it evidenced its intention not to relinquish its rights to terminate the sublease by sending P.C. Management statements for each utility payment as it became due and for the amounts past due. Appellant's brief at 16. We disagree. The trial court reasonably determined Page Two's actions evidenced its intent to forego, rather than preserve, its right to terminate the sublease. First, upon P.C. Management's anticipatory breach by refusing to pay its share of the utilities, Page Two had the right to declare the sublease terminated at least [3] after ten (10) days notice or after P.C. Management failed to pay any month's utility payment within thirty (30) days. Page Two did not. Second, Page Two failed or refused to consider and/or respond to P.C. Management's letters of protest which belies its argument of accomodation. In other words, Page Two's conduct in not terminating the sublease agreement and, instead, accepting rental payments, after it had explicit knowledge P.C. Management was not going to pay the billed amounts, and in stonewalling P.C. Management's protests, constituted the waiver. This conduct was not a mere delay in the exercise of Page Two's power to terminate the lease, (which the court said is not a "persuasive consideration" in *B.J.M. Realty Corp. v. Ruggieri* (1963), 2nd Cir., 326 F.2d 281, 283) but was delay coupled with knowledge that payment was disputed and not forthcoming. This evidence reasonably supports the conclusion Page Two was intentionally relinquishing its right to terminate the sublease. The trial court did not err in determining Page Two waived its right to terminate the sublease based upon the utility dispute.

*Life Endowment Co. v. Carithan* (1915), 62 Ind. App. 567, 109 N.E. 851, *Trans. Denied.*

3. *See* footnote 2.

### B.

Page Two also argues the trial court erred in determining that, although the sublease agreement so provided, Page Two could not terminate the sublease agreement when P.C. Management defaulted on its contractual obligation to maintain fire, casualty and personal injury insurance upon the subleased premises.

Paragraph 8 of the sublease agreement required P.C. Management to maintain fire, casualty and personal injury insurance "in such amounts as are mutually agreed by the parties and memorialized in an attachment to the sublease." Record at 394, Exhibit 3. Paragraph 18 provided that Page Two could terminate P.C. Management's possessory rights for "neglecting or failing to perform any of the terms of the sublease." *Id.* The trial court, however, concluded "[t]he matter of insurance was a minor default ... which does not justify the forfeiture of the Sublease Agreement by P.C. Management." [4] Record at 163.

As a general rule, an express provision in a lease that allows the breach of a covenant to work a forfeiture of the agreement, is enforced if the breach is material.

While forfeitures are never favored in law, yet when ... it appears that the contracting parties agreed that a forfeiture should take place, upon the failure of one of the parties to the contract to comply with a material part thereof, courts will decree a forfeiture.

*Faylor v. Brice* (1893), 7 Ind.App. 551, 553, 34 N.E. 833, 833. As an aid to determining materiality, a question of fact, this court, in *Goff v. Graham* (1974), 159 Ind.App. 324, 306 N.E.2d 758, adopted the succinct enumeration of factors to be considered in determining the materiality of a breach found in the Restatement of Contracts § 275:

(a) The extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated;

4. The trial court also concluded Page Two waived the insurance default. However, for many reasons, we affirm on the trial court's alternative ground.

(b) The extent to which the injured party may be adequately compensated in damages for lack of complete performance;

(c) the extent to which the party failing to perform has already partly performed or made preparations for performance;

(d) The greater or less hardship on the party failing to perform in terminating the contract;

(e) The wilful, negligent or innocent behavior of the party failing to perform;

(f) The greater or less uncertainty that the party failing to perform will perform the remainder of the contract.

Assuming the insurance provision was breached, although the supplemental agreement required by the covenant apparently was not executed, we can only conclude, based upon the Restatement considerations, that the evidence does not lead to a conclusion contrary to that reached by the trial court.

Page Two was not harmed by the omitted coverage inasmuch as there is no evidence that it incurred liability due to the omitted coverage. After the coverage in question was terminated, P.C. Management did not use the sublet premises for any business, the premises were locked, secured, and serviced by a twenty-four hour monitored alarm, and "presented no significant risk of loss." Record at 161–62. In addition, from the time Page Two first became the sublessor, it never concerned itself with the question of insurance. Finally, P.C. Management offered to reinstate the omitted coverage. These considerations reasonably support the trial court's determination the assumed breach of the insurance covenant was not sufficiently material to justify the termination of the lease.

## II.

■ Page Two argues the trial court erred in determining that "as a matter of law, the March 6, 1986 lease did not oper-

ate to terminate the Sublease Agreement of P.C. Management." Record at 163. It asserts error based upon its contention that the new master lease issue was withdrawn by the parties and was not determinative of the case.[5]

Page Two is incorrect. The new master lease was received in evidence as a stipulated exhibit, thus it was properly before the fact finder. Further, P.C. Management's complaint for declaratory judgment raised the issue of "whether plaintiff is entitled to and did extend its sublease agreement for another two (2) year term commencing November 15, 1986." Record at 12. Accordingly, P.C. Management had the burden of proving its right, under its sublease agreement, to renew its term. Inasmuch as that agreement provided it was subject to the master lease and further, that the sublease terminated upon the termination of the master lease, the existence or termination of the original master lease was an essential element of P.C. Management's burden of proof. Accordingly, the issue was raised in the pleadings irrespective of Page Two's "affirmative defense" and the trial court did not err in determining the question.[6]

For the reasons stated above, we affirm the trial court's decision.

BUCHANAN, J., concurs.

SULLIVAN, J., concurs in result.

---

5. In a denominated "affirmative defense" Page Two alleged the sublease agreement terminated when Page Two entered into a new Master Lease with the owners of the building. At trial, Page Two withdrew this affirmative defense.

6. Page Two does not challenge the content of the finding; it merely claims the trial court erred in making a finding on the subject.